[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10549

_____

D.C. Docket No. 8:12-cv-01161-EAK-MAP

SEVERIN HEGEL and STEPHANIE HEGEL,

Plaintiffs - Appellees,

versus

THE FIRST LIBERTY INSURANCE CORPORATION,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 27, 2015)

Before ED CARNES, Chief Judge, COX and GILMAN,[*] Circuit Judges.

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

GILMAN, Circuit Judge:

This case involves an insurance-coverage dispute that began in 2011 between Severin and Stephanie Hegel (the Hegels) and The First Liberty Insurance Corporation (First Liberty).   The Hegels claim that First Liberty improperly denied their claim for a "sinkhole loss," defined under their homeowner's insurance policy as "structural damage to the building, including the foundation, caused by sinkhole activity."   First Liberty argues that the damage to the Hegels' residence does not qualify as "structural damage," a term that was not defined in either the policy or the version of the Florida sinkhole-insurance statute applicable to their claim.   In February 2014, the district court granted summary judgment for the Hegels, finding that "structural damage" meant any "damage to the structure" and awarding them $166,518.17 in damages.   First Liberty timely appealed.

For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

A.    **Factual background**

*1. The insurance policy and Florida's sinkhole-insurance statute*

The Hegels had a homeowner's insurance policy with First Liberty for their Spring Hills, Florida residence, effective October 5, 2010.   This policy insured

2

against "Sinkhole Loss" as an exception to the policy's exclusion for damage caused by earth movement.   Under the policy, "Sinkhole Loss means *structural damage to the building*, including the foundation, caused by sinkhole activity."   (Emphasis added.)   The policy, however, did not define the term "structural damage."

The version of the Florida statute governing sinkhole insurance that was in effect in 2010 contained the same definition of "sinkhole loss" as the policy did, but similarly failed to define the term "structural damage."   *See* Fla. Stats. § 627.706(2)(c) (2005).   Prior to the statute being substantially amended in 2005, however, the term "sinkhole loss" was defined as "*actual physical damage* to the property covered arising out of or caused by sudden settlement or collapse of the earth supporting such property."   Fla. Stats. § 627.706(3) (1981) (emphasis added).

The Florida Building Code (2004), on the other hand, defined "structural" as it relates to buildings:

> For purposes of this code, "structural" shall mean any part, material or assembly of a building or structure which affects the safety of such building or structure and/or which supports any dead or designed live load and the removal of which part, material or assembly could cause, or be expected to cause, all or any portion to collapse or fail.

Fla. Bldg. Code, Existing Buildings § 202 (2004).   And a May 17, 2011 amendment to Florida Statutes § 627.706 eventually provided a detailed, technical definition of "structural damage," itself referencing the Florida Building Code:

3

(2)(k) "Structural damage" means a covered building, regardless of the date of its construction, [that] has experienced the following:

1. Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;

2. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the primary structural members or primary structural systems that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

3. Damage that results in listing, leaning, or buckling of the exterior load-bearing walls or other vertical primary structural members to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

4. Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5. Damage occurring on or after October 15, 2005, that qualifies as "substantial structural damage" as defined in the Florida Building Code.

4

Fla. Stats. § 627.706(2)(k) (2011).

### 2. *The damage and estimates of repair*

The Hegels allege that, on March 1, 2011, they "discovered damage to their home, including, but not limited to, progressive physical damage to the walls and floors of the residence." They subsequently submitted a claim for their damages to First Liberty under their homeowner's policy.

First Liberty retained Structural Engineering and Inspections, Inc. (SEI) to investigate the claim in September 2011. SEI concluded in a report that the Hegels' residence "<u>DOES NOT MEET</u> the criteria for *Structural Damage* as defined by Florida Statutes §627.706 [2011]." (Emphases in original.) The SEI report noted some cracking and other issues, but determined that nothing rose to the level of "structural damage" as defined in the 2011 version of the statute. In addition, SEI listed several possible causes for the observed damage that were unrelated to sinkholes, including differential settlements and ordinary concrete shrinkage. First Liberty accordingly denied the Hegels' claim in October 2011, stating that their residence "ha[d] not sustained structural damage to the building or foundation" and that the damage was "related to normal concrete shrinkage, differential settlement, and improper embedment of [the] foundation."

5

In November 2011, the Hegels requested a neutral evaluation by a public adjuster.   Kevin Scott, the neutral evaluator engaged for the claim, issued a report in July 2012.   He noted that if the sinkhole claim was made under a policy with an effective date before May 17, 2011, then the 2011 definition of "structural damage" set forth in Florida Statutes § 627.706 would not apply.   His report concluded that the damage to the Hegels' residence was "the result of a combination of factors, including sinkhole activity," but that "the observed distresses to the house can primarily be attributed to minor differential settlement of the structure and normal shrinkage/drying characteristics of the masonry materials."   Ultimately, Scott recommended subsurface grouting, at an estimated cost of $105,075, to remediate the sinkhole activity.   He did not, however, apply any particular definition of "structural damage" to his evaluation, finding only that "[t]here was physical damage that resulted from settlement."

The Hegels subsequently hired Central Florida Testing Laboratories, Inc. (CFTL) to review the findings and recommendations of SEI and the neutral evaluator, and to conduct additional testing.   CFTL, in a report issued in March 2013, found damage consisting of "widespread, minor cracking to both the exterior and interior of the home."   Like the neutral evaluator, CFTL determined that sinkhole activity was a contributing cause of the damage.   To fully remediate the

6

effects of the sinkhole activity, the report recommended shallow chemical grouting in addition to the deep compaction grouting program proposed by the neutral evaluator, and estimated the total cost at $145,775. The Hegels next retained Champion Foundation Repair to prepare a bid based on CFTL's recommended remediation plan, with the bid coming in at $141,180. Finally, the Hegels retained Triad Consulting Group (Triad) to estimate the cost of repairing cosmetic damages. Triad's bid totaled $20,743.17.

**B.    Procedural background**

In April 2012, before the neutral evaluator had completed his report, the Hegels filed suit against First Liberty for breach of contract in the Fifth Judicial Circuit Court in and for Hernando County, Florida. First Liberty removed the case the following month to the United States District Court for the Middle District of Florida based on diversity of citizenship. It also filed an unopposed motion to stay the litigation until the neutral evaluation was completed. The case was reopened in September 2012, after which First Liberty filed a counterclaim for a declaratory judgment that the Hegels' claimed damage falls outside the scope of the homeowner's insurance policy.

The two parties next filed competing motions for summary judgment. First Liberty submitted that its counterclaim was a pure question of contract law and that

there were no genuine disputes of material fact.  It argued that the May 17, 2011 amendment to the definition of "structural damage" in Florida Statutes § 627.706 should be incorporated into the contractual definition of the term, and that the term could not mean simply any "damage to the structure."

In their motion, the Hegels claimed that they had met their burden of proving that the damage to the residence came within the terms of the policy, noting that First Liberty had not submitted any evidence to refute the opinions of the neutral evaluator and CFTL that sinkhole activity existed.  The Hegels further argued that summary judgment on the damages claim was appropriate because First Liberty had not challenged any of the estimates of monetary damages.

To obtain expedited appellate review of the contract-interpretation question, and solely for the purposes of summary judgment, First Liberty stipulated that should the district court conclude that "structural damage" means any "damage to the structure," First Liberty would admit that such damage exists and was caused by sinkhole activity, and would accept the Hegels' submitted monetary-damages estimates.

The district court denied First Liberty's summary-judgment motion in September 2013, relying on prior, unpublished Middle District of Florida decisions considering similar disputes under Florida law.  It held that the term "structural

8

damage" should be interpreted to mean any "damage to the structure." Later decisions from the same court, however, have defined "structural damage" more narrowly. *See Gonzalez v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 1219, 1231 (M.D. Fla. 2013) (holding that "structural damage" means "damage that impairs the structural integrity of the building"); *Franqui v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-01257-T-27MAP, 2014 WL 1092405, at *7 (M.D. Fla. Mar. 18, 2014) (unpublished) (holding that "structural damage" means "damage to the structural components of the building, excluding damage that is cosmetic in nature").

In February 2014, the district court granted the Hegels' motion for summary judgment, awarding them $166,518.17 in damages plus prejudgment interest. Final judgment was entered on February 5, 2014. First Liberty timely filed a notice of appeal two days later.

## II.   ANALYSIS

### A.    Standard of review

We review an order granting summary judgment de novo and apply the same legal standards that governed the district court's decision. *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1293 (11th Cir. 2013). A district court properly grants summary judgment when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

9

*Chapman v. Procter & Gamble Dist., LLC*, 766 F.3d 1296, 1312 (11th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted).

Contract interpretation is subject to the same de novo review.  *Am. Cas. Co. v. Etowah Bank*, 288 F.3d 1282, 1285 (11th Cir. 2002).   Because insurance policies are considered contracts, "[i]nterpretation of insurance policy language is [also] a matter of law, subject to *de novo* review."   *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. Dist. Ct. App. 2002) (citing *Coleman v. Fla. Ins. Guar. Ass'n*, 517 So. 2d 686 (Fla. 1988)); *see also Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 924 (11th Cir. 1998).   Questions of statutory interpretation are likewise reviewed de novo.   *Boroski v. Dyncorp Int'l*, 700 F.3d 446, 450 (11th Cir. 2012).

**B.**     **The district court erred in equating the contractual term "structural damage" with any "damage to the structure"**

On appeal, First Liberty sets forth two independent, alternative theories to support its argument that the district court's contractual interpretation was erroneous: (1) the plain meaning of "structural damage" cannot be any "damage to the structure" in the context of the contractual phrase "structural damage to the building"; and (2) the insurance policy incorporates the definitions of "structural" under the Florida Building Code (2004) and "structural damage" as "clarified" by the 2011 amendment to Florida Statutes § 627.706, such that the term "structural damage" must mean more than any "damage to the structure."   We agree with First

10

Liberty that the plain meaning of "structural damage" cannot be simply any "damage to the structure" in the relevant context. As to the more technical definitions of "structural" and "structural damage" contained in the Florida Building Code and Florida Statutes § 627.706, however, we disagree with the proposition that they are incorporated into the insurance policy.

### 1. The plain meaning of the term "structural damage" as used in the context of the insurance policy cannot be any "damage to the structure"

"Because federal jurisdiction over this matter is based on diversity, Florida law governs the determination of the issues on this appeal." *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004). In interpreting insurance policies,

> Florida courts start with the plain language of the policy as bargained for by the parties. If that language is unambiguous, it governs. If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous, and must be interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy.

*Id.* (quoting *Auto-Owners Ins. Co. v Anderson*, 756 So. 2d 29, 34 (Fla. 2000)) (internal quotation marks omitted).

Both the Hegels and First Liberty contend that the term "structural damage" is unambiguous and should be given its "plain meaning," but the parties disagree on

11

what that meaning is.   Even the district judges in the Middle District of Florida, in interpreting the same term in similar insurance policies under Florida law, have reached opposite conclusions.   *Compare Ayres v. USAA Cas. Ins. Co.*, No. 8:11-cv-816-T-24TGW, 2012 WL 1094321, at \*4 (M.D. Fla. Apr. 2, 2012) (unpublished) (holding that "structural damage" means "damage to the structure"), *with Gonzalez v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 1219, 1231 (M.D. Fla. 2013), *and Franqui v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-01257-T-27MAP, 2014 WL 1092405, at \*7 (M.D. Fla. Mar. 18, 2014) (unpublished).

This court has held that "differing interpretations of the same provision is evidence of ambiguity, particularly when a term is not explicitly defined or clarified by the policy."   *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993) (citation omitted).   On the other hand, the lack of a definition in a policy "does not necessarily render the term ambiguous and in need of interpretation by the courts."   *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998).   And the directive to interpret insurance policies liberally in favor of the insured applies "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." *Excelsior Ins. Co. v Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979).

12

Here, no genuine ambiguity exists because construing "structural damage" to mean simply any "damage to the structure" in the context of the insurance policy is facially unreasonable. Defining "structural damage" as such merely begs the question of what is "structural" or "structure," and what does either mean within the phrase "structural damage to the building"? Terms and phrases cannot be viewed in isolation; "courts must construe an insurance contract in its entirety, striving to give every provision meaning and effect." *Dahl-Eimers*, 986 F.2d at 1381 (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979)).

The district court awarded the Hegels damages for all subsurface and cosmetic repairs based on the parties' stipulation that there was "physical damage to Plaintiffs' home." Because "structural damage" is necessary for the Hegels to recover under the policy, the court must have equated "physical damage to Plaintiffs' home" with "structural damage to the building." Equating the two, however, essentially defines "structural damage" as "physical damage"—an untenable result. Such a construction would render the word "structural" meaningless because all property damage is physical, thereby violating a foundational rule of contract construction that every word be given effect. *See Equity Lifestyle Props., Inc. v. Fla. Mowing And Landscape Serv., Inc.*, 556 F.3d

13

1232, 1242 (11th Cir. 2009) ("[This court] must read the contract to give meaning to each and every word it contains, and . . . avoid treating a word as redundant or mere surplusage 'if any meaning, reasonable and consistent with other parts, can be given to it.'" (quoting *Roberts v. Sarros*, 920 So. 2d 193, 196 (Fla. Dist. Ct. App. 2006))). Indeed, at oral argument, counsel for the Hegels was unable to identify what type of damage to the property would not be "structural" under their preferred definition.

The key problem here is one of confusion between the words "structural" and "structure." In construing insurance-policy terms, Florida courts "commonly adopt the plain meaning of words contained in legal and non-legal dictionaries." *Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1513 (11th Cir. 1986) (citing *Gov't Emps. Ins. Co. v. Novak*, 453 So. 2d 1116, 1118 (Fla. 1984)). "Structural" is an adjective, defined in the *Oxford English Dictionary* as "[f]orming a necessary part of the structure of a building or other construction, as distinct from its decoration or fittings." *Structural,* adj., Oxford English Dictionary, http://www.oed.com/view/ Entry/191887 (June 2014) (last visited Feb. 26, 2015). The noun "structure," on the other hand, is simply a synonym for a building. *See Structure,* n., Oxford English

14

Dictionary, http://www.oed.com/view/Entry/191895 (June 2014) (last visited Feb. 26, 2015) (defining "structure" as "[a] building, an edifice").[1]

Based on these definitions, "damage to the structure" would encompass any physical damage to a building, even if only cosmetic, whereas "structural damage" would exclude damage to a building's "decoration or fittings." Any structural damage would necessarily encompass damage to the building, but the opposite is not necessarily true; i.e., many types of lesser damage to a building would not be structural damage. To equate "structural damage" with any "damage to the structure," as the district court did, is thus untenable.

Even the Hegels in their appellate brief appear to retreat from the district court's definition, arguing instead that the "damage must be to the structure itself as determined by professional engineers." But this definition is no better than the district court's definition because it fails to account for how professional engineers assess "structural damage." Kevin Scott, the neutral evaluator and a professional engineer, defined the term as follows: "It's damage which impedes the structural components from supporting the loads that they are intended to support. That is my engineering opinion of structural damage." Scott's definition is essentially the

---

[1] In keeping with Eleventh Circuit Internal Operating Procedure 10 under Federal Rule of Appellate Procedure 36, 'Citation to Internet Materials in an Opinion,' a copy of the internet materials cited in this opinion is available at this Court's Clerk's Office.

15

same as the only published district-court decision to squarely decide the plain meaning of the term.  *See Gonzalez v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 1219, 1231 (M.D. Fla. 2013) (interpreting "structural damage" to mean "damage that impairs the structural integrity of the building").  We agree with the excellent analysis in *Gonzalez* and therefore construe the phrase "structural damage to the building" to mean "damage that impairs the structural integrity of the building."

> **2.    *"Structural damage" as used in the 2005 version of Florida's sinkhole-insurance statute does not mean "damage to the structure"***

Both parties acknowledge that the 2005 version of Florida Statutes § 627.706 applies to the Hegels' insurance policy.  Although that version does not define the term "structural damage," the legislative history behind its enactment is fully consistent with our determination regarding the plain meaning of the term.  Recall that, in 2005, the Florida legislature changed the definition of "sinkhole loss" from "actual physical damage to the property covered" to "structural damage to the building."  Ch. 2005-111, § 17, Laws of Fla.  In making the 2005 revision, the legislature's intention was "generally to reduce the number of sinkhole claims and related disputes arising under prior law."  Ch. 2011-39, § 21, Laws of Fla.  This statement strongly implies that "structural damage" is different from—and more restrictive than—"actual physical damage."

16

### 3. Definitions from other sources are not relevant in determining the plain meaning of the term "structural damage" as used in the Hegels' insurance policy

First Liberty urges us to incorporate into the insurance policy the relatively narrow definitions of "structural" as set forth in the Florida Building Code (2004) and "structural damage" as "clarified" by the 2011 amendment to Florida Statutes § 627.706.   But we must determine the plain meaning of the term "structural damage" utilizing the procedure required by Florida law.   *See Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291-92 (Fla. 2007) (stating that insurance contracts are construed according to their plain meaning and that, when doing so, courts may consult dictionary definitions).   "[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties."   *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 965 (11th Cir. 2014) (quoting *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So. 2d 529, 532 (Fla. 2005)) (internal quotation marks omitted).   And an insurer cannot, "by failing to define the terms [in a policy] . . . , insist upon a narrow, restrictive interpretation of the coverage provided."   *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993) (internal quotation marks omitted).   We therefore decline to incorporate these specific definitions into the Hegels' insurance policy.

17

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.  This will require the district court to decide if a genuine dispute of material fact exists regarding how much, if any, structural damage to the Hegels' house (as properly defined) is due to sinkhole activity.  The district court's determination on this issue will in turn lead to either a new grant of summary judgment for the appropriate party or to a trial on the merits.