[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15386

_____

D.C. Docket No. 3:12-cv-00601-RV-EMT


SOUTHERN-OWNERS INSURANCE COMPANY,

Plaintiff - Counter Defendant - Appellee,

versus

EASDON RHODES & ASSOCIATES LLC, et al.,

Defendants - Counter Claimants,

LINNIE D. RHODES,

Defendant,

DAVID W. MOORE, DENISE MOORE,

Defendants - Counter Claimants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 29, 2017)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and GOLDBERG,[*] Judge.

TJOFLAT, Circuit Judge:

This case arises from a dispute over the scope of the insurance coverage provided by a standard form Hired Auto and Non-Owned Auto Liability Endorsement to a corporate general liability insurance policy (the "Endorsement") issued by Southern-Owners Insurance Company ("Southern-Owners") to Easdon Rhodes & Associates, LLC ("Easdon Rhodes"). Following an auto accident involving one of its members, Joshua Rhodes, Easdon Rhodes was named as one of several defendants in a state court negligence action filed by David Moore, who suffered serious injuries in the crash.[1] Southern-Owners agreed to defend the suit in state court but reserved its rights to deny coverage under the terms of the Endorsement. Subsequently, Southern-Owners filed an action in the United States District Court for the Northern District of Florida seeking a declaratory judgment absolving it of the duty to indemnify or defend Easdon Rhodes, or the other defendants, against Moore's negligence suit. After Southern-Owners moved for summary judgment, the District Court held that the vehicle driven by Joshua

---

[*] Honorable Richard W. Goldberg, Senior Judge for the U.S. Court of International Trade, sitting by designation.

[1] David Moore's wife, Denise Moore, also brought a loss of consortium claim based on the injuries suffered by her husband. Because her cause of action is entirely derivative of her husband's negligence claim, we will refer to David Moore as the sole plaintiff in the underlying state court action. *See Gates v. Foley*, 247 So. 2d 40, 45 (Fla. 1971) (explaining that loss of consortium "is a derivative right"). Further, for ease of reference, we treat Moore as the only appellant presently before us.

2

Rhodes did not qualify for coverage under the terms of the Endorsement, and, even if the vehicle had qualified, the existence of a separate insurance policy also covering the accident triggered the Endorsement's exclusion clause absolving Southern-Owners of its duties under the policy. Easdon Rhodes appealed, arguing the vehicle driven by Joshua Rhodes qualified for coverage and that the Endorsement's exclusion clause was ambiguous and could not provide Southern-Owners with a basis to deny coverage for the accident under Florida law. With the benefit of oral argument, and after a searching review of the parties' briefs and the record, we affirm the District Court's judgment.

## I.

Joshua Rhodes and Mark Easdon formed Easdon Rhodes, a limited liability company, to provide a variety of maintenance- and construction-related services. Shortly after formation, the company purchased a corporate general liability insurance policy from Southern-Owners. Automobiles were specifically excluded from coverage under the original policy, but Easdon Rhodes purchased an Endorsement which expanded coverage to include certain categories of automobiles. The text of the Endorsement included an exclusion clause explaining coverage was only provided under the provision if "you do not have any other insurance available to you which affords the same or similar coverage." The

3

policy limit for bodily injury and property damage claims covered by the Endorsement was $1,000,000.00.

On April 1, 2011, a Chevrolet Silverado driven by Joshua Rhodes collided with a motorcycle driven by David Moore, causing Moore serious injuries. At the time of the accident, the Silverado was protected by a personal auto insurance policy issued by Nationwide Mutual Insurance Company (the "Nationwide policy"). In addition to the Silverado, that policy also insured two other vehicles and provided, among other things, coverage for bodily injury and property damage. The Nationwide policy limit for bodily injury was $25,000.00.

Following the collision, David Moore and his wife Denise Moore filed a negligence suit against Joshua Rhodes in state court. Approximately a year later, the action was amended to name Easdon Rhodes as an additional defendant. In response to Moore's filings, Nationwide tendered its policy limit of $25,000, and, under a reservation of rights, Southern-Owners agreed to provide Easdon Rhodes with a defense. Southern-Owners then filed this action in the United States District Court for the Northern District of Florida seeking a declaration that it has no obligation to defend or indemnify Easdon Rhodes, or the other defendants, against Moore's negligence claim.

Southern-Owners moved for summary judgment on April 1, 2014, arguing the Nationwide policy provided coverage similar to that available under the

4

Endorsement and consequently relieved Southern-Owners of any duty to defend or indemnify Easdon Rhodes under the plain terms of the insurance contract. Southern-Owners also argued the Silverado driven by Joshua Rhodes was not covered by the Endorsement in the first instance because it did not meet the policy's definition of a hired or non-owned auto. The District Court agreed with Southern-Owners' interpretation of the Endorsement and, on October 30, 2014, granted summary judgment in Southern-Owners' favor, absolving the insurer of any duty to defend or indemnify Easdon Rhodes against Moore's underlying negligence suit.

## II.

We review "a district court's grant of summary judgment de novo applying the same legal standards used by the district court." *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 (11th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). We also review *de novo* a district court's interpretation of contract language. *Nat'l Fire Ins. Co. v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003).

## III.

## A.

5

In this diversity action, we must apply "the substantive law of the forum state." *Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843, 844 (11th Cir. 1998).  Here, we look to Florida law to determine whether Southern-Owners owed a duty to indemnify or defend its insured against Moore's suit in state court.  In Florida, the terms used in an insurance contract are given their ordinary meaning, and the policy must be construed as a whole "to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).  The Florida Supreme Court has emphasized the necessity of interpreting the "terms of an insurance policy . . . in their ordinary sense [to provide] a reasonable, practical and sensible interpretation consistent with the intent of the parties." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (quoting *Gen. Accident Fire & Life Assurance Corp. v. Liberty Mut. Ins. Co.*, 260 So. 2d 249, 253 (Fla. Dist. Ct. App. 1972)).  An unambiguous policy provision is "enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. Dist. Ct. App. 1996).

If policy language is susceptible to multiple, reasonable interpretations, however, the policy is considered ambiguous and must be "interpreted liberally in

favor of the insured and strictly against the drafter who prepared the policy."[2]

*Auto-Owners*, 756 So. 2d at 34.  To allow for such a construction, the insurance

policy "must actually be ambiguous."  *Taurus Holdings, Inc. v. U.S. Fid. & Guar.*

*Co.*, 913 So. 2d 528, 532 (Fla. 2005).   Courts are not authorized "to put a strained

and unnatural construction on the terms of a policy in order to create an uncertainty

or ambiguity."  *Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc.*, 586 So. 2d 95,

97 (Fla. Dist. Ct. App. 1991).  The mere fact that an insurance provision is

"complex" or "requires analysis" does not make it ambiguous.  *Swire Pac.*

*Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003).

## B.

The central interpretative question presented here is whether the existence of

a separate insurance policy, which paid policy limits for the underlying claim at

issue, qualifies as "similar insurance" under the Endorsement's exclusion clause

thereby absolving Southern-Owners of any duty toward its insured, Easdon

Rhodes.  The exclusion clause provides that insurance protection is only available

under the Endorsement "if you do not have any other insurance available to you

which affords the same or similar coverage."  The parties do not dispute that the

Nationwide policy insuring the Silverado driven by Joshua Rhodes qualifies as

---

[2] This rule applies with even greater force in the context of exclusion clauses which courts must "construe[] even more strictly against the insurer than coverage clauses." *Auto-Owners*, 756 So. 2d at 34.

7

"other insurance" and that the Nationwide policy does not offer the "same" coverage as the Endorsement. So, whether the Endorsement's exclusion clause applies to relieve Southern-Owners of a duty to defend or indemnify Easdon Rhodes depends on the meaning of "similar coverage," a term left undefined by the policy.[3]

Southern-Owners contends the phrase "similar coverage" is susceptible to only a single reasonable interpretation within the context of the Endorsement's exclusion clause: "that it triggers whenever another policy . . . is available to pay for the same liability claimed under the policy at issue." Moore disagrees and argues the "similar coverage" language is ambiguous because it could also be reasonably interpreted to require the presence of another insurance policy covering the same overall set of risks as the Southern-Owners corporate general liability policy, not just the specific liability claimed. As Florida law requires the interpretation of ambiguous insurance policies in favor of coverage, Moore asserts Southern-Owners cannot use the Endorsement's exclusion clause to justify disclaiming its duty to defend and indemnify Easdon Rhodes. Because we find only a single reasonable interpretation of the Endorsement's exclusion clause exists, we decline Moore's invitation to manufacture uncertainty and now hold that

---

[3] Because we ultimately hold the Endorsement's exclusion clause unambiguously applies to deny Easdon Rhodes coverage here, we need not address the parties' other interpretative arguments regarding the provision's overall scope.

the clause unambiguously operates to deny Easdon Rhodes insurance coverage here.

Neither party has provided binding authority interpreting the phrase "similar coverage," nor have we been able to locate such authority on our own.[4] We must interpret the clause ourselves beginning with discerning the phrase's plain meaning via "references [that are] commonly relied upon to supply the accepted meaning of [the] words." *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010) (quoting *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 292 (Fla. 2007)). Similar means "alike in substance" or "having characteristics in common." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1093 (10th ed. 1999). And, in the insurance context, coverage is defined as the "[i]nclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." *Coverage*, BLACK'S LAW DICTIONARY 446 (10th ed. 2014). This definition suggests "coverage," as used in the Endorsement, has two potential meanings. The term may either refer specifically to the inclusion of an individual risk covered by an insurance policy, or it may broadly refer to the overall scope of protection a particular insurance policy offers.

---

[4] Moore primarily relies on a single unpublished decision, *Southern-Owners Ins. Co. v. Wall 2 Walls Constr., LLC*, 592 F. App'x 766 (11th Cir. 2014), interpreting identical language in another Southern-Owners policy. However, we are not bound by unpublished decisions. *See* U.S. Ct. of App. 11th Cir. R. 36-2 (providing that "[u]npublished opinions are not considered binding precedent").

Fortunately, we may use the broader context surrounding the phrase "similar coverage" to select between these two possible meanings. *See, e.g.*, *State Farm Mut. Auto Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. Dist. Ct. App. 2009) (explaining a "single policy provision should not be read in isolation and out of context, for the contract is to be construed according to its entire terms, as set forth in the policy and amplified by the policy application, endorsements, or riders"). Here, the wording of both the Endorsement's exclusion clause and the Coverages section of the Southern-Owners corporate general liability policy supports adopting the narrower definition of "coverage" which specifically refers to the "[i]nclusion of a risk under an insurance policy." *Coverage*, BLACK'S LAW DICTIONARY 446 (10th ed. 2014).

First, an examination of the exclusion clause itself reveals the term "coverage" is intended to reference particularized risks included within a policy rather than the entire scope of protection the policy offers. The word "coverage" in the exclusion clause is immediately preceded by the verb "affords" and the identification of the two discrete risks, bodily injury and property damage, for which the Endorsement provides protection. To "afford" is commonly defined as "to furnish, bestow, grant, [or] yield." OXFORD ENGLISH DICTIONARY 222 (2d ed. 2001). So, with this definition in mind, the exclusion clause most naturally reads as disclaiming insurance protection under the Endorsement "if you do not have any

10

other insurance available to you which [furnishes protection against the same or similar risks, property damage or bodily injury, as provided by the Endorsement]."

This interpretation conforms to the typical understanding of the word "coverage" when it is employed in ordinary conversation regarding discrete, particularized risks—insurance consumers simply want to know whether insurance will cover, or assume the cost of, the risk at issue. The full suite of protections provided by the insurance policy is not relevant to the basic inquiry into whether a policy insures against a particular identifiable risk. As the District Court succinctly explained, common sense tells us that in the context of an endorsement to an insurance contract adding protection against specific risks otherwise excluded by the policy, the word "coverage" refers to the specific risk protection being added rather than the universe of risks covered by the entire policy. Such an understanding fully comports with the requirements of Florida law which urges us to interpret the words of an insurance policy in their "ordinary sense." *See Siegle*, 819 So. 2d at 736.

Our understanding of "coverage" as referring to the inclusion of a specific risk in an insurance policy is reinforced by the term's repeated use within the Coverages section of the Southern-Owners corporate general liability policy at issue here. The Endorsement itself explicitly uses coverage in reference to the two specific types of risks it covers, "Bodily Injury and property damage liability . . .

11

arising out of the maintenance or use of an 'auto.'"  Elsewhere, the Coverages section of the Southern-Owners corporate general liability policy delineates the particular risks of which Southern-Owners pledges to assume the costs.  In both cases, the use of the term "coverage" is tied to the specific types of risk protected by the policy.  Nowhere in the policy does Southern-Owners use the term "coverage" to broadly refer to the entire universe of risks associated with the insurance contract.  Instead, the word continually appears in the context of detailed explanations for a *specific* risk for which the policy provides coverage.

Additionally, Florida law tells us we must give each term and provision in an insurance policy operative effect and that we must avoid constructions rendering particular phrases mere surplusage.  *See U.S. Fid. & Guar. Co. v. Romay*, 744 So. 2d 467, 471 (Fla. Dist. Ct. App. 1999).  Only by interpreting "coverage" to mean the "[i]nclusion of a risk under an insurance policy" do we ensure that our construction of the Endorsement gives full effect to the proceeding phrase in the provision's exclusion clause, "any other insurance."  *See Coverage*, BLACK'S LAW DICTIONARY 446 (10th ed. 2014).  Any means "one or some indiscriminately of whatever quantity."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 53 (10th ed. 1999).  So, the phrase "any other insurance" must refer to all forms of insurance regardless of the type of policy or the amount of protection provided.  Interpreting coverage to refer to the inclusion of a specific risk in an

12

insurance policy preserves this meaning by indicating the form or type of the other insurance at issue is irrelevant.   Instead, the Endorsement's exclusion clause remains solely concerned with whether the other available insurance protects against the same risks as the Endorsement rather than whether it offers the same overall level of protection.  If both the Endorsement and the other available policy specifically protect against the same or similar risk at issue, the exclusion clause would apply and eliminate Southern-Owners' obligations under the terms of the Endorsement.

On the other hand, interpreting "coverage" to refer to the overall scope of the protection provided by an insurance policy effectively reads the "any other insurance" phrase out of the Endorsement's exclusion clause.  Such an interpretation shifts the clause's frame of analysis from an evaluation of the specific risk insured against to the overall scope of coverage offered by the Endorsement and underlying corporate general liability policy.  Under this construction, the clause would functionally apply only to other non-owned auto endorsements to corporate general liability policies, because any form of individual auto insurance would by definition protect a broader universe of vehicles from a different set of risks.  This approach would render the "any other insurance" language in the Endorsement essentially meaningless since only a very specific type of insurance would ever fall within the exclusion clause's purview.

13

Not only would this reading of the Endorsement directly contravene Florida law by reading out relevant policy language, but it would also ignore the practical realities of the insurance market. Companies and individuals purchase insurance for the purposes of protecting themselves against particular risks. It is in their interest to minimize duplicative insurance which serves only to increase cost without providing a commensurate increase in protection. Thus, the typical insurance consumer is extremely unlikely to buy insurance policies with the idea of providing duplicative coverage for risks their existing insurance already covers. If increased insurance protection for such a risk becomes necessary, it would almost always be simpler to increase the amount of coverage on the existing policy rather than incur the transaction costs associated with acquiring duplicative coverage through another policy.[5] We see that exact scenario born out here through the Endorsement which provides a limited amount of non-duplicative coverage at a very low cost as compared to a generalized duplicative insurance policy. Indeed, the Endorsement carries an annual premium of only $61.29 and provides a policy limit of $1,000,000.00 for bodily injury or property damage. By comparison, the bodily injury coverage provided by the personal Nationwide policy also in place on

_____

[5] Excess-liability and umbrella policies are also available to provide additional insurance where consumers desire more coverage than their policies extend. These policies are not duplicative because they are not triggered until the policy limits of the underlying insurance policy are exhausted.

14

the Silverado at the time of the collision provided a policy limit of only $25,000.00 at an annual cost of $470.00.

This basic understanding of the insurance market also offers strong evidence that the parties intended to define "coverage" as "[i]nclusion of a risk under an insurance policy." *Coverage*, BLACK'S LAW DICTIONARY 446 (10th ed. 2014).  In the original corporate general liability policy Southern-Owners provided to Easdon Rhodes, risks stemming from the use of automobiles were expressly excluded from the policy.  As Florida law makes clear, the addition of a non-owned automobile Endorsement was for a specific purpose—to "provide coverage to the insured while engaged in infrequent or casual use of an automobile." *Lancer Ins. Co. v. Gomez*, 799 So. 2d 334, 336 (Fla Dist. Ct. App. 2001).  While the Endorsement would not totally exempt Easdon Rhodes from paying premiums for ordinary auto insurance, it would provide cheap, emergency protection for bodily injury and property damage stemming from the temporary business use of a hired or borrowed auto that might not be adequately insured otherwise.  The Endorsement's exclusion clause reinforces this narrow purpose by making clear the provision only applies when this particularized risk is not protected against by "any other [available] insurance."

Easdon Rhodes must have been aware of the basic functioning of the Endorsement because the company affirmatively added the provision to its

15

Southern-Owners corporate general liability insurance policy.  Presumably, this action was taken because the maintenance and construction business conducted by the company would occasionally necessitate the temporary use of various automobiles not separately insured by the corporation or its members.  In order to cheaply protect itself from the potential risks stemming from the use of these temporary vehicles, Easdon Rhodes requested and received a narrowly tailored Hired Auto and Non-Owned Auto Liability Endorsement to its corporate general liability policy. It cost about $400 less per year than the Nationwide policy also covering the Silverado at the time of the collision while providing a policy limit approximately forty times higher.  This substantial discrepancy in cost and policy limit speaks volumes regarding the intended reach of the Endorsement's exclusion clause.  Such a low price for such expansive coverage is only adequately explained by the presence of an exclusion clause which routinely applies, since the specific risks dealt with by the Endorsement would almost always be covered by some other auto insurance policy.  Interpreting coverage to refer to the overall scope of the risks dealt with by a particular policy, as Moore suggests, would gut the exclusion clause's intended effect, and Easdon Rhodes would effectively be receiving an insurance windfall via the Endorsement, a nonsensical result.

Accordingly, in the context of the Endorsement's exclusion clause, only a single reasonable interpretation of the phrase "similar coverage" exists: that it

16

refers to "another policy . . . [that] is available to pay for the same [or similar]

liability claimed under the policy at issue."  In this case, the Nationwide policy in

place at the time of the accident easily falls within this definition.  As the District

Court explained, the simple fact the Nationwide policy has already paid its policy

limit to cover the underlying accident sufficiently evidences that it provides similar

coverage to that offered by the Endorsement.  Indeed, the Nationwide policy goes

beyond mere similarity and includes protection against exactly the same risks as

the Endorsement, bodily injury and property damage.  Accordingly, the

Endorsement's exclusion clause operates unambiguously to relieve Southern-

Owners of any duty to defend or indemnify Easdon Rhodes, or the other

defendants, against Moore's negligence action.[6]

Moore is correct to point out that we recently reached the opposite

conclusion when interpreting identical language in an unpublished decision,

*Southern-Owners Insurance Co. v. Wall 2 Walls Construction, LLC,* 592 F. App'x

766 (11th Cir. 2014).  However, that decision's rationale was almost entirely

focused on the ambiguity introduced by the exclusion clause's use of the term

---

[6] This common sense conclusion is hardly controversial.  Indeed, applying Michigan law, we have previously applied an exclusion clause using comparable "same or similar coverage" language without any discussion of potential ambiguity.  *See McGow v. McCurry*, 412 F.3d 1207, 1218–20 (11th Cir. 2005), *abrogated on other grounds by Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010).

"similar." *See id.* at 770.[7]  We agree with our decision in *Wall 2 Walls* to the extent that we found the word "similar" ambiguous, standing alone.  *Id.*  Without an adequate frame of comparative reference, it becomes extremely difficult to pinpoint exactly in what respects and to what extent insurance policies must be alike to properly qualify as "similar."  However, the opinion in *Wall 2 Walls* failed to consider the meaning of "coverage" within the context of the policy it examined. *See id.*  Properly defined as the inclusion of a specific risk under an insurance policy, "coverage" supplies the exact limiting factor required to sensibly deploy a word like "similar."  As we have discussed, the plain meaning of "coverage" limits the application of "similar" to the simple question of whether a risk is included in an insurance policy or not.  This provides a reasonably precise metric to guide a reader's understanding of the word "similar" and obviates any ambiguity the term, standing alone, might otherwise have.

Moore's argument that differences in policy limits between the Nationwide policy and the Endorsement indicates the coverages are not similar is likewise unavailing.  First, as extensively discussed above, "coverage," within the context of the insurance industry, refers to the risks a particular policy protects against, not

---

[7] Our decision in *Wall 2 Walls*, like Moore, also relied on the longstanding Florida rule that ambiguous policy provisions ought to be construed in favor of coverage. *See Wall 2 Walls*, 592 F. App'x at 770.  We do not quibble with this doctrinal point.  We simply conclude the meaning of the policy provision before us is plain and susceptible to only a single reasonable interpretation.

18

how much protection the insurance policy actually provides.  Thus, the amount of protection offered is a distinct inquiry from the type of coverage and is not implicated by the phrase "same or similar coverage."  *See Bergman v. Hutton*, 101 P.3d 353, 357–58 (Or. 2004) (defining coverage separately from the limits of insurer liability provided by the policy itself);  *Am. States Ins. Co. v. Kesten*, 561 N.W.2d 486, 487 (Mich. Ct. App. 1997) (rejecting an argument that coverages are not similar based on different available policy limits as "specious"); *Smart v. Safety Ins. Co.*, 643 N.E.2d 435, 437 (Mass. 1994) (determining that, so long as coverage of a particular risk was "not illusory," it would still qualify as similar insurance to another policy offering a substantially greater amount of coverage); *see also Hamilton v. Gov't Emps. Ins. Co.*, 662 A.2d 568, 571–72 (N.J. Super. Ct. App. Div. 1995) (defining the type or scope of coverage a policy provides as a distinct inquiry from the coverages' policy limit).

Furthermore, interpreting "coverage" as referencing not just the type but also the amount of coverage produces absurd results.  Adopting this interpretation would mean "similar coverage" exclusion clauses would trigger only if the other available insurance policy dealing with the same risks also had an analogous coverage limit.  This position reflects an unrealistic view of the method in which consumers purchase insurance.  Given the transaction costs involved, purchasing multiple duplicative coverages for the same risk simply does not make sense.  To

19

the extent coverages overlap at all, it is likely that different policy limits would be available under each policy to reflect the different insurance objectives sought by the insured.  It is difficult to imagine a scenario offering a rational justification for purchasing multiple policies all offering the same amount of protection for the same risk and even *more* difficult to imagine a potential justification for purposefully drafting an exclusion clause to bar coverage in this most unlikely context.  We are satisfied that the plain meaning of the Endorsement's exclusion clause is concerned only with the type rather than amount of available "similar [insurance] coverage."

## IV.

Admittedly, we have engaged in extensive analysis to justify the common sense conclusion that an exclusion clause denying coverage in the event the insured has available "any other insurance with the same or similar coverage" applies when the insured has another insurance policy paying policy limits for the underlying liability.  But Florida law is clear that ambiguity does not result simply because complex analysis is required to discern the plain meaning of a provision of an insurance contract.  *See Swire Pac. Holdings*, 845 So. 2d at 165.  Indeed, Florida courts have repeatedly cautioned that it is improper to "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties" while seeking to identify ambiguity not actually present

in the insurance policy.  *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)).

The Endorsement at issue here is not a model of clarity or precision.  But before the policy may be construed against Southern-Owners and in favor of the insured, we must determine if an ambiguity exists based upon the presence of multiple reasonable interpretations of the policy language, not the inherent indeterminacy of linguistic expression.  *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979) (noting the Florida rule requiring the interpretation of ambiguous insurance policies in favor of coverage applies "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction").  Southern-Owners does not need to create a crystal clear insurance policy.  It need only provide an unambiguous one.  It has carried that modest burden.  We decline Moore's invitation to manufacture ambiguity where none exists.  Because we find the Endorsement's exclusionary clause unambiguously denies coverage in this case, we affirm the District Court's grant of summary judgment.

**AFFIRMED.**