[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-13769
Non-Argument Calendar
_____

D.C. Docket No. 6:18-cv-01048-GAP-EJK

STARSTONE NATIONAL INSURANCE COMPANY,

Plaintiff - Counter Defendant,
Appellee,

versus

POLYNESIAN INN, LLC,
d.b.a. Days Inn of Kissimmee,

Defendant - Counter Claimant,
Appellant,

ANDREW JAMES BICKFORD,

Defendant - Appellant,

JANE DOE,
as Personal Representative of the Estate of
Zackery Ryan Ganoe,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 12, 2020)

Before ROSENBAUM, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

In this insurance coverage dispute, Appellants Polynesian Inn, LLC ("Polynesian"), and Andrew Bickford appeal the district court's grant of summary judgment to StarStone National Insurance Company ("StarStone") on StarStone's complaint seeking a declaration that it owed Polynesian no coverage under an excess liability policy because the underlying claim was subject to a "sublimit" of liability in the primary coverage. Appellants maintain that no "sublimit," properly defined, applies in this case. After careful review, we affirm.

## I.

In April 2017, a woman wielding a knife attacked Bickford and Zackery Ganoe while they were guests at a hotel operated by Polynesian in Kissimmee, Florida. The woman stabbed Ganoe to death and slashed Bickford's throat. Bickford survived and then made a claim for damages against Polynesian,[1] which, at the time of the incident, was insured by a primary general-liability policy issued

---

[1] Ganoe's estate also made a claim but is not a party to this appeal.

by Northfield Insurance Company ("Northfield") and an excess-liability policy issued by StarStone (previously Torus National Insurance Company).

The primary Northfield policy provides $1 million in liability coverage per occurrence, subject to a $2 million aggregate limit. In its unmodified form, the policy provides coverage for, among other things, sums that Polynesian became liable to pay as damages because of "bodily injury." However, the Northfield policy includes an endorsement entitled "Limited Assault or Battery Liability Coverage" (the "A&B Endorsement"). In relevant part, the A&B Endorsement (a) adds an exclusion to coverage for "bodily injury" arising out of any "assault" or "battery" committed by any person; (b) creates a separate coverage provision for "bodily injury" caused by "an assault or battery offense"; and (c) establishes limits of $25,000 for each assault or battery offense, subject to a $50,000 aggregate limit. There is no dispute that Bickford's claim is subject to the $25,000 limit.

The issue here is whether the StarStone policy provides excess coverage. The StarStone policy, which has a $3,000,000-per-occurrence limit, is a "following form" excess-liability policy, meaning it "follows the definitions, terms, conditions, limitations and exclusions of the Followed Policy"—here, the Northfield policy. StarStone agreed to pay sums in excess of the Northfield policy's "Total Limits"[2]

---

[2] The StarStone policy describes the "Total Limits" of the Northfield policy as follows:

$1,000,000          Per Occurrence

3

that the insured becomes legally obligated to pay as damages.  At the same time, the StarStone policy does not provide coverage "with respect to or as a result of any of the following clauses or similar clauses in the Followed Policy: . . . 3. *Sublimit of liability, unless coverage for such sublimit is specifically endorsed to this Policy*."  Doc. 80-4 at 5 (emphasis added)**.**

When Polynesian submitted Bickford's claim to StarStone, it denied coverage and then filed this action for a declaratory judgment.  StarStone maintained that it owed no coverage for Bickford's claim because the A&B Endorsement, which applied to the claim, was a "sublimit of liability."  The parties filed competing motions for summary judgment, and the district court granted summary judgment to StarStone.  This appeal followed.

## II.

We review *de novo* the district court's grant of summary judgment, applying the same standards as the district court.  *Southern-Owners Ins. Co. v. Easdon Rhodes & Assocs. LLC*, 872 F.3d 1161, 1163 (11th Cir. 2017).  We also review *de novo* the district court's interpretation of contract language.  *Id.* at 1164.

---

| $2,000,000 | Other Aggregate |
| Included in GL | Products/Completed Operations Aggregate |
| $1,000,000 | Personal and Advertising Injury |
| $1,000,000 | Combined Single Limit |

Under Florida law, which governs this diversity action,[3] the "interpretation of a contract is a question of law subject to de novo review." *Horizons A Far, LLC v. Plaza N. 15, LLC*, 114 So. 3d 992, 994 (Fla. Dist. Ct. App. 2012). Contract interpretation is governed by the intent of the parties, which is "determined from the plain language of the agreement and the everyday meaning of the words used." *Id.* We look at the policy "as a whole and give every provision its full meaning and operative effect." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quotation marks omitted); *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992) ("To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract."). To aid the interpretation of insurance-policy terms, "Florida courts commonly adopt the plain meaning of words contained in legal and non-legal dictionaries." *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1221 (11th Cir. 2015) (quotation marks omitted).

Ambiguous provisions are construed against the insurer and in favor of coverage. *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274-75 (11th Cir. 2008). "A contract provision is considered ambiguous if the relevant policy language is susceptible to more than one reasonable interpretation, one

---

[3] *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1148 (11th Cir. 2010) (stating that, in diversity cases, "state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress").

providing coverage and the other limiting coverage." *Id.* (quotation marks omitted). But an insurance policy that is plain and unambiguous must be enforced as written. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007).

In interpreting the terms "sublimit" or "sublimit of liability," which are not defined in the insurance policies at issue, Appellants focus on the prefix "sub-," which is defined in part as meaning "under," "below," "beneath," or "subordinate." *Sub-*, Dictionary.com, https://www.dictionary.com/browse/sub-?s=t (last visited May 21, 2020); *Sub-*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/sub- (last visited May 21, 2020). From these meanings, they reason that a limit is a sublimit only if it is "subordinate to (or under) another limit," in the same way that a "subcontractor" is subordinate to or under a primary contractor. If a limit is not subordinate to another limit, their argument goes, it is a "standalone limit" even if it is lower than some other limit in the policy. And in their view, the A&B Endorsement is not a sublimit because it exists apart from and is not under or subordinate to the $1 million-per-occurrence limit.

StarStone replies that the A&B Endorsement fits within the well-recognized definition of "sublimit" because it caps the insurer's exposure at an amount below the ordinary policy limit for a particular type of loss. In support of that argument, StarStone points to the International Risk Management Institute's ("IRMI") online glossary of insurance terms, which defines "sublimit" as

6

a limitation in an insurance policy on the amount of coverage available to cover a specific type of loss. A sublimit is part of, rather than in addition to, the limit that would otherwise apply to the loss. In other words, it places a maximum on the amount available to pay that type of loss, rather than providing additional coverage for that type of loss.

*Sublimit*, Int'l Risk Mgmt. Inst., *Glossary – Insurance and Risk Management Terms*, https://www.irmi.com/term/insurance-definitions/sublimit (last visited May 21, 2020).

We conclude that the district court correctly granted summary judgment to StarStone. As we see it, the IRMI definition of "sublimit" adopted by the district court is consistent with the ordinary meaning of that term as reflected in legal and non-legal dictionaries. *See Hegel*, 778 F.3d at 1221. The term "sublimit" has been defined generally as "a limit on a subcategory," *Sublimit*, Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/sublimit (last visited May 21, 2020), and more specifically as "a liability limit in an insurance policy for a particular risk (as loss of jewelry by theft) that is below the aggregate liability limit of the policy," *Sublimit*, Merriam-Webster.com Legal Dictionary, https://www.merriam-webster.com/legal/sublimit (last visited May 21, 2020). These definitions are consistent with the IRMI definition in describing "sublimit" as a lower limit on a particular subcategory of loss.

Moreover, the IRMI definition uses the prefix "sub" in a way that is synonymous with "under," "below," or "beneath," three of the four meanings put

forth by Appellants. Contrary to Appellants' assertion, a limit is not a sublimit under the IRMI definition merely because it is lower than some other limit. Rather, the limit must be "part of, rather than in addition to, the limit that would otherwise apply to the loss." In other words, the subcategory of loss to which a sublimit applies is under, below, or beneath the broader category of loss and the corresponding limit that would have applied absent the sublimit.

Therefore, under the ordinary meaning of that term, the A&B Endorsement qualifies as a sublimit because it caps the insurer's exposure at an amount below the ordinary policy limit for a subcategory of loss. *See Century Sur. Co. v. Seductions, LLC*, 349 F. App'x 455, 457–58 (11th Cir. 2009) (describing a similar endorsement in passing as a "sublimit"). Without the A&B Endorsement, bodily injury resulting from assault or battery is covered by the Northfield policy's general $1 million-per-occurrence limit for "bodily injury." The A&B Endorsement operates to cap Northfield's liability for that subcategory of loss at $25,000. In other words, the effect of the A&B Endorsement was to cap *existing* coverage for a particular subcategory of loss, not to create a new category of coverage that did not exist before the A&B Endorsement. The A&B Endorsement is therefore properly viewed as "part of, rather than in addition to, the limit that would otherwise apply to the loss."

Appellants' arguments in response are unconvincing. Appellants claim that insurance-industry definitions are "immaterial" under Florida law. But they vastly

8

overstate Florida law on this point, which merely cautions that terms "extracted from the vernacular of the insurance industry should never transcend the common understanding of the ordinary person." *Hrynkiw v. Allstate Floridian Ins. Co.*, 844 So. 2d 739, 741–42 (Fla. Dist. Ct. App. 2003). For the reasons we have explained above, the IRMI definition is consistent with common understanding.

Plus, Appellants' own convoluted interpretation of the A&B Endorsement "transcend[s] the common understanding of the ordinary person." *Id.* Appellants focus on the particular way in which the A&B Endorsement creates a lower limit for bodily injury resulting from assault or battery. They note that the A&B Endorsement, after adding an exclusion to bodily injury coverage for assault or battery, creates a separate coverage provision for assault and battery offenses with its own limit that is not expressly made subject to the $1 million-per-occurrence limit. Because the lower limit for assault and battery offenses is not "subordinate to" the $1 million limit, they argue, it is not a sublimit of that limit.

But we fail to see why these facts would cause an "ordinary person" to view the A&B Endorsement as something other than a sublimit. In interpreting policy language, we consider the policy "as a whole," *Steinberg*, 393 F.3d at 1230, and in view of the "the object and purpose of the contract," *Am. Home Assurance Co*, 593 So. 2d at 197. As explained above, the purpose and effect of the A&B Endorsement as a whole is to cap existing coverage for bodily injury resulting from assault or

battery, not to provide additional coverage for that type of loss. In that regard, Appellants' reliance on *Lark v. Western Heritage Ins. Co.*, 64 F. Supp. 3d 802 (W.D. Va. 2014), is misplaced because *Lark*—which did not address sublimits, in any case—involved a policy that "explicitly exclude[d] coverage for damages arising from assault and battery," and the insured "separately bargained for the additional assault and battery endorsement." *Id.* at 811. In other words, the endorsement in *Lark*, in contrast to the A&B Endorsement here, provided "additional coverage that [the insured] otherwise would not have enjoyed under the general policy—coverage for assault and battery." *Id.*

Alternatively, even if we were to assume that the A&B Endorsement is not technically a sublimit because it was not expressly made subordinate to the ordinary per-occurrence limit, it is assuredly a "similar clause[]" within the meaning of the StarStone policy. By excluding coverage where a "sublimit of liability" or "similar clause[]" applies, the policy ensures that StarStone does not take on greater risk with respect to certain subcategories of loss unless there is some additional agreement to cover that loss. For instance, in this case, under Appellants' interpretation, StarStone's excess coverage responsibilities would be triggered at $25,000 for losses resulting from assault or battery but at $1,000,000 for nearly every other type of covered loss. That result is plainly inconsistent with the intent of the "sublimit"

provision and with other terms of the policy, including the "Total Limits" definition, which sets StarStone's various coverage responsibilities at no less than $1 million.

For all of these reasons, we conclude that the A&B Endorsement is a "sublimit of liability" or "similar clause[]" under the "plain language of the agreement[s] and the everyday meaning of the words used." *Horizons A Far*, 114 So. 3d at 994. We therefore affirm the district court's summary judgment that StarStone owes no coverage to Polynesian in excess of the limits of the Northfield policy with respect to Bickford's claim.

**AFFIRMED.**