[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13451

Non-Argument Calendar

_____

DATAMAXX APPLIED TECHNOLOGIES, INC.,
a Florida corporation,

Plaintiff-Appellant,

*versus*

BROWN & BROWN, INC.
d.b.a. Halcyon Underwriters, Inc., et al.,

Defendants,

CHUBB CUSTOM INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00291-CEM-DCI

_____

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Datamaxx Applied Technologies, Inc., ("Datamaxx") appeals from the district court's grant of summary judgment in favor of Chubb Custom Insurance Co., ("Chubb"), in Datamaxx's suit seeing a declaratory judgment that the parties' insurance contract obligated Chubb to indemnify Datamaxx in a 2018 lawsuit brought by a third-party, Gold Type Business Machines, Inc., ("GTBM"). The district court granted Chubb's motion for summary judgment after concluding that Datamaxx's 2018 indemnification claim "correlate[d]" to Datamaxx's conduct underlying a 2014 settlement between it and GTBM, which, in turn, "correlate[d]" to Datamaxx's indemnification claim to its previous insurer, AIG, in that case, placing it outside Chubb's coverage agreement. After careful review, we affirm.

## I.     BACKGROUND

Prior to the onset of the present litigation, GTBM, a software provider, developed and sold a product called "Info-Cop," which permits "National Crime Information Center ("NCIC") terminal operators"—including, but not limited to, law enforcement officers—to access motor vehicle and warrant information from multiple law enforcement databases from remote locations.  Seeking to exploit the broader market of non-NCIC terminal operators, GTBM patented a process and system to permit non-NCIC terminal operators to query the NCIC, Criminal Justice Information System ("CJIS"), and other restricted systems in a manner compliant with applicable rules and regulations regarding the access, use, and dissemination of such data.

GTBM subsequently entered into a Development and License Agreement, ("DLA"), with Datamaxx—a software provider for law enforcement, public safety organizations, and the security industry—to incorporate GTBM's system into Datamaxx's existing product suite, Omnixx, to create a jointly-developed "Enhanced Product."  In exchange, Datamaxx would share the sales revenue from the "Enhanced Product" with GTBM. Pursuant to the DLA, GTBM licensed its patent "together with other intellectual property rights (including trade secrets and confidential business information) to [Datamaxx] solely to develop, make use,

sell, and offer to sell the contemplated" "Enhanced Product." Furthermore, the parties agreed to label any product that fell within their agreed-upon definition of "Enhanced Product" with their jointly-owned "GREENLIGHT" trademark.

But according to GTBM, rather than promoting GREENLIGHT—the "Enhanced Product" version of Omnixx—Datamaxx used the enhanced product code and marketed its own competing product, Omnixx+.  Consequently, GTBM simultaneously filed suit and initiated arbitration against Datamaxx, alleging, in relevant part, that Datamaxx incorporated its product source code into Omnixx+, violating the terms of the DLA which exclusively limited the use of that code to GREENLIGHT.  Datamaxx reported the lawsuit to its then-insurer, AIG, in September 2013.  Ultimately, the parties settled in May 2014.  Although AIG partially reimbursed Datamaxx for the settlement payment, Datamaxx released AIG from any future "related" claims.

Following the parties' settlement, and initially unbeknownst to GTBM, Datamaxx marketed a separate product, "Redtail."  In GTBM's view, Redtail, a visitor management system that cross-checks a visitor's identification with various security databases—including the FBI's, various DMVs', and the Sex Offender registry—shares Greenlight's functionality and infringes on its patented process.

In 2018, Datamaxx entered a new liability and indemnity insurance policy with Chubb, effective on April 15, 2018.  Coverage

applied on a "claims-made basis."  Under the policy's "Claims Made Liability Coverage Common Provisions:"

> C. All claims that correlate with an act will be deemed to have been made at the time the first of such claims is deemed to have been made . . .
>
>          . . .
>
> F. This coverage does not apply to any damages, loss, cost or expense in connection with any claim that correlates with an act, if such act also correlates with any claim deemed to have been made before the beginning of this policy period.

The policy defined an "act" as "an act, error, or omission.  Includes all correlated acts, errors, omissions and all series of continuous or repeated acts, errors or omissions."  Datamaxx and Chubb did not define "correlate" in the policy agreement.

Later that year, Datamaxx notified GTBM that it intended to terminate the DLA, effective December 2018, but planned on continuing to market and sell Redtail.  As a result, in October 2018, GTBM again initiated arbitration against Datamaxx, alleging, as pertains to this appeal, that Datamaxx breached the parties' settlement agreement, the DLA, and the two agreements' implied covenants of good faith and fair dealing.  GTBM contended that, as part of the settlement, Datamaxx agreed that it had not and would not develop or sell any additional product using any code written for the parties' "Enhanced Product."  Likewise, GTBM maintained that Datamaxx agreed not to market or sell any new product

competing with the "functionality of Greenlight or any Enhanced Product." Nevertheless, GTBM alleged that Datamaxx's development, marketing, and sale of Redtail used GTBM's proprietary code and technological know-how to compete with Greenlight. Moreover, GTBM claimed that, by developing Redtail under its own brand, Datamaxx deprived GTBM of revenue to which it was entitled, "defeat[ing] the objects of the Settlement Agreement [and the DLA] and depriv[ing] GTBM of the fruits of [those] agreement[s] . . . ."

Datamaxx tendered an indemnification claim to Chubb on October 29, 2018, and, after Chubb denied coverage in December 2018, it sent one to AIG, as well. Datamaxx then filed the present lawsuit against Chubb, seeking a declaratory judgment of Chubb's obligation to defend and indemnify it in the GTBM litigation. Datamaxx and GTBM settled the second lawsuit in January 2020.

Before the district court, Datmaxx and Chubb cross-motioned for summary judgment with respect to Chubb's duty to indemnify Datamaxx. Addressing Chubb's argument that coverage did not extend to Datamaxx's 2018 GTBM litigation claim because it related to Datamaxx's 2014 litigation claim, the district court analyzed the language in the policy's "Claims-Made Liability Coverage" provision. Noting that neither party claimed that the provision's use of the word "correlate" was ambiguous, the district court found that various dictionaries define "correlate" synonymously with "relate," and applied our precedent from cases involving "related claims" provisions. First, pointing to our

decision in *Continental Casualty Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000), the district court explained that "related" claims include "both logical and causal connections." The district court concluded that the acts alleged in both the 2014 and 2018 litigation "involve [Datamaxx] improperly using the Greenlight code in its own, competing product." Put another way:

> While the products themselves differ, the acts are essentially the same. In both [suits] . . . it is alleged that [Datamaxx] used the proprietary information, patented method, and code related to Greenlight to develop and sell its own competing product, that [Datamaxx] failed to pay GTBM as they agreed, and that [Datamaxx] was undermining the entire business partnership between it and GTBM by utilizing the fruits of that partnership to develop its own products to compete with the partnership's product. The overarching plan and mod[us] operandi in the acts underlying the [suits] were nearly identical.

Indeed, the district court emphasized that, because the 2018 suit "alleges a breach of the settlement of the First GTBM Litigation[,] [i]t would simply defy logic to conclude that those claims are not related." And, as a result of its determination that the 2018 claims correlated to the acts underlying the 2014 litigation, the district court found that they predate the policy's coverage period and were not covered by the parties' agreement. Consequently, the district court granted summary judgment in Chubb's favor and denied Datamaxx's motion for summary judgment.

Datamaxx timely appealed.

## II.    ANALYSIS

On appeal, Datamaxx argues that the district court erred by treating the "Claims-Made Liability Coverage" portion of the policy as a coverage prerequisite, rather than an exclusion, and that Chubb failed to carry its burden to establish that the exclusion applied to the 2018 litigation claims. In Datamaxx's view, Chubb cannot prevail because the acts underlying the 2014 lawsuit do not "correlate" to those implicated in the 2018 suit. Datamaxx further maintains that the district court improperly conflated "related claims" provisions with the "narrower" and "reciprocal, causal" correlating claims provision to which the parties agreed, and therefore erred in applying our precedent on "related claims" provisions. We disagree.

We review *de novo* both a district court's order granting summary judgment and its interpretation of language in an insurance contract. *See Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019); *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015).

"Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy. The burden of proving an exclusion to coverage is, however, on the

21-13451                Opinion of the Court                    9

insurer."[1] *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997) (internal citation omitted).[2]  And, where policy language is "susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered 'ambiguous' and must

---

[1] Contrary to Datamaxx's position, the "Claims-Made Liability Coverage" portion of the policy is a coverage prerequisite, not an exclusion.  Under Florida law, "[i]nsurance policies may contain exclusionary provisions that exclude certain risks from the scope of coverage, and exclusionary provisions may carve out coverage exceptions for losses that ensue from an excluded cause of loss." *Liberty Mut. Fire Ins. Co. v. Martinez*, 157 So. 3d 486, 488 (Fla. 5th DCA 2015) (citing *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 167-168 (Fla. 2003)).  In other words, an exclusion removes the insurer's obligation to cover something which, absent that exclusion, would otherwise fall within the coverage afforded by a given policy.

Yet, the "Claims-Made Liability Coverage" policy provision clarifies that "this insurance applies only if: . . . such **act** was not first committed before the applicable Retroactive Date shown in the Declarations or after the end of the policy period," before explaining that, to receive coverage, claims must first be made against an insured "after the beginning of the policy period; . . . before the end of the policy period; or" during a third period not relevant to this appeal.  However, for coverage purposes, "[a]ll claims that correlate with an **act** will be deemed to have been made at the time the first of such claims is deemed to have been made."  Consequently, any act correlating to a claim made prior to the inception of coverage is deemed to have been made prior to coverage, placing it outside the policy period.  Accordingly, the policy provision does not "exclude [any] risks from the scope of coverage," and is therefore not an exclusion. *See Martinez*, 157 So. 3d at 488.

[2] Both parties agree that Florida law applies because the policy was issued and delivered to Datamaxx in Florida and does not contain any contrary choice of law provision.

be 'interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy.'" *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000)). Nevertheless, "the mere failure to provide a definition for a term involving coverage does not necessarily render the term ambiguous." *Wendt*, 205 F.3d at 1262.

This appeal turns on the definitions of two contractual terms, one defined by the parties and one left to common usage. The insurance policy defines the first term, "act," as "an act, error or omission," and "includes all correlated acts, errors or omissions and all series of continuous or repeated acts, errors or omissions." The second term, "correlate," requires us to look outside the policy. Datamaxx does not provide us with a specific definition, instead referring the Court to the Merriam-Webster online dictionary.

After looking at the dictionary, the district court treated "correlates" and "relates" as synonymous and proceeded to apply our precedent in *Wendt* and a series of unpublished cases to determine whether, weighing a series of factors, the act underlying the 2018 litigation bore logical and causal connections to Datamaxx's 2014 claim. But *Wendt* dealt with claims that "relate," not claims that "corelate." *See Wendt*, 205 F.3d at 1263. We agree with Datamaxx that Chubb "did not draft a 'related claims' exclusion . . . and instead opted for 'correlates[,]'" which "must be considered consequential."

Datamaxx insists that "correlates" "connotes reciprocal, causal relationships." Granted, Merriam-Webster defines the transitive verb "correlates" to mean, "establish[ing] a mutual or reciprocal relation between," "show[ing] correlation or a causal relationship between," or "present[ing] or set[ting] forth so as to show relationship." "Correlate." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/correlate. But it defines "correlation" "*specifically*" to mean "a relation existing between phenomena or things or between mathematical or statistical variables which tend to vary, be associated, or occur together in a way not expected on the basis of chance alone." "Correlation." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/correlation. In other words, although causation begets correlation, correlation does not imply causation. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 800 (2011) (Scalia, J.) (explaining that studies "based on correlation, not evidence of causation," do not establish causative relationships). Thus, although "correlates" is narrower than "relates," as used in the policy it requires nothing more than a showing that acts and claims "tend to vary, be associated, or occur together in a way not expected on the basis of chance alone." *See supra* "Correlate;" "Correlation."

Datamaxx insists that its 2014 claim bears no correlation to the act underlying its 2018 claim because the two Datamaxx products at issue, Omnixx+ and Redtail, "worked differently."

More specifically, Datamaxx maintains that in 2014, GTBM alleged that it "reverse-engineered" Greenlight source code and incorporated it into Omnixx+, or, "[a]t its essence, the first lawsuit claimed that Datamaxx misappropriated GTBM's Greenlight source code for its own and falsely held out Omnixx+ as a different product when it was really the same." On the other hand, Datamaxx explains that GTBM never claimed that GTBM used Greenlight source code, but, instead "that users of Redtail were able to access Greenlight's 'functionality' through a back-end application programming interface, called an 'API.'"[3]

Although we appreciate the significant difference between source code and APIs, in this case, the way in which the product operated is a distinction without a difference. Datamaxx freely admits in its brief that:

> [a]n API is just a method by which two applications "talk to" each other. The dispute in the 2018 arbitration, then, was over whether Datamaxx was permitted to sell a product (Redtail) that 'talked to' background search databases *through* Greenlight. The user interacted directly with

_____

[3] "What is an API? The Federal Circuit described an API as a tool that 'allow[s] programmers to use . . . prewritten code to build certain functions into their own programs, rather than write their own code to perform those functions from scratch.' Through an API, a programmer can draw upon a vast library of prewritten code to carry out complex tasks." *Google LLC v. Oracle America, Inc.*, --- U.S. ----, 141 S. Ct. 1183, 1191 (2021) (quoting *Oracle America, Inc. v. Google, Inc.*, 750 F.3d 1339, 1349 (Fed. Cir. 2014)).

Redtail, and the Greenlight API allowed information to pass to and from other applications on other networks.

We agree with Datamaxx's characterization of the 2018 litigation and associated claim. However, contrary to Datamaxx's claims on appeal, GTBM's 2013 complaint explicitly accuses Datamaxx of stealing and selling the source code for Greenlight's API, specifically, and depriving GTBM of its share of the resulting market recognition and revenue.

Tellingly, in disputing the district court's conclusion that the acts underlying its 2018 claim "correlate" to the 2014 claims, Datamaxx concedes that, in the earlier suit: "GTBM claimed Datamaxx was liable . . . because it cut out Greenlight altogether." Put another way, GTBM sued Datamaxx because it developed a unique product that integrated GTBM's proprietary API code without adhering to the agreed-upon revenue-sharing or labeling schemes for any product using that code.

Likewise, after settling its first lawsuit for breaking its agreement and depriving GTBM of the revenue and market-recognition to which it was entitled, Datamaxx built another system that not only interfaced, but also competed, with Greenlight's API, without adhering to the agreed-upon revenue-sharing or labeling schemes for any product using GTBM's code. In either case, GTBM's claim was never really that "Datamaxx was liable . . . because it cut out Greenlight altogether," but, instead, that Datamaxx was liable because it cut out GTBM, altogether.

Hence, Datamaxx's second attempt to circumvent and violate the DLA necessarily correlates to—or "tend to vary, be associated, or occur together in" an unusual way—the 2014 claim stemming from its first attempt to circumvent and violate the DLA. After GTBM sued Datamaxx for cutting it out of the deal by recreating Greenlight, Datamaxx allegedly tried again by building a new application that would draw information from Greenlight without requiring Datamaxx to share the resulting revenue. Because Chubb has produced evidence that Datamaxx previously tried to avoid paying GTBM for the Greenlight API in 2013, Chubb has carried its burden to show that Datamaxx's repeated, but slightly different, attempts to profit from the Greenlight API without paying GTBM "tend to vary" together.

Because Chubb has shown that Datamaxx's 2018 claim "correlates" to an act correlating to a claim made before the onset of policy coverage, the district court properly granted summary judgment in Chubb's favor.

**AFFIRMED.**