**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-11479

————————————————

FLORIDA EAST COAST HOLDINGS CORPORATION,

*Plaintiff-Appellant,*

*versus*

LEXINGTON INSURANCE COMPANY,

  d.b.a. American International Group Inc.,

ASPEN SPECIALTY,

HOUSTON CASUALTY,

ALLIED WORLD,

IRONSHORE SPECIALTY, et al.,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cv-00747-TJC-PDB

————————————————

Before WILLIAM PRYOR, Chief Judge, and BRANCH and ABUDU,
Circuit Judges.

BRANCH, Circuit Judge:

In 2017, Florida East Coast Holdings Corporation ("Florida East Coast"), which operates a railroad in Florida, learned that Hurricane Irma was likely to hit Florida and could cause significant physical damage to its property—damage which would, in turn, slow its operations for weeks. As a precautionary measure, Florida East Coast removed the crossing gates from the tracks at around 600 locations before the storm and then replaced them after Irma had passed. Florida East Coast believed that its preventative measures were covered by its insurance policy, but the insurers eventually denied its claim, concluding that the relevant deductible swallowed up any covered expenses. In the ensuing lawsuit, the district court agreed with the insurers and granted them summary judgment.

After careful consideration and with the benefit of oral argument, we conclude that the district court correctly identified the policy provisions offering coverage but erred in calculating the deductible. We therefore affirm in part, vacate the grant of summary judgment, and remand for further proceedings consistent with our opinion.

## I.    Background

### A.    Factual background[1]

Florida East Coast insured its railroad through a policy with Lexington Insurance Company and other underwriters ("the insurers"). The policy ran from March 1, 2017, through March 1, 2018, and covered, among other things, Florida East Coast's property related to its railroad operations. In early September 2017, Florida East Coast learned that Hurricane Irma had formed over the Atlantic Ocean and was likely to hit Florida. Anticipating that the storm would cause significant damage to its railway crossing gates—and that broken gates might cause collateral damage to other structures and people—Florida East Coast removed crossing gates from around 600 locations and stored them. Without gates at the railroad crossings, human personnel were needed to man crossings, and trains had to run at significantly slower speeds. Thanks to these precautions, however, Hurricane Irma did not inflict the anticipated damage. After the storm passed, Florida East Coast reinstalled the crossing gates, and its railroad operations continued as usual.

Florida East Coast immediately informed the insurers of its expenses related to Hurricane Irma. It later hired an accounting firm, Pyxis Group, LLC, to determine the exact amount of its

---

[1] Because we are reviewing the district court's grant of summary judgment to the insurers, we view the evidence and factual inferences in the light most favorable to Florida East Coast, the nonmoving party. *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015).

losses. Pyxis concluded that Florida East Coast's total losses related to Hurricane Irma were $5,605,881. After a few years of communications about the claim, the insurers ultimately denied Florida East Coast's claim in December 2020 on the ground that its losses were below the relevant deductible.

### B.    *Policy provisions*

Whether Florida East Coast is due any payment related to its Hurricane Irma expenses turns on which coverage provisions and which deductible provisions of its insurance policy apply.[2] The parties invoke various policy provisions as potentially relevant, each reproduced below.

The policy consists of five sections, lettered A through E, followed by several individual endorsements. Section A, "Declarations," includes a list of deductibles that apply in various situations and explanations for how they interact. First, the policy specifies,

> A.    When this Policy insures more than one property, the deductible will apply against the total loss covered by this Policy in any one occurrence.
>
> B.    If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest

---

[2] The parties do not dispute that under the terms of the policy, the insurers are liable only if the insured sustains a loss greater than the applicable deductible.

deductible    applicable    unless    otherwise provided.

The parties do not dispute that the hurricane and related preventative activities constitute a single occurrence, nor do they dispute that a single deductible governs all of Florida East Coast's claims.

The deductibles section then lists a number of specific deductions, including the following:

$100,000 combined all coverages except:

$750,000 as respects **Railroad Operations** except;

5% of property values at locations damaged from and as respects **Named Windstorm** including or any combination of Flood resulting from Named Windstorm subject to a minimum deductible of $750,000.

The parties do not dispute that Hurricane Irma was a "Named Windstorm."

The next two sections offer specific provisions related to certain types of coverage. Section B deals with property damage, and Section C covers time element loss. The parties agree that Florida East Coast was covered under at least one provision in each section, but they dispute which provisions apply.

Section B, "Property Damage," begins with an "Insuring Clause," noting that the policy "insures against all risks of direct physical loss or damage to the insured property occurring during the policy period from any cause," subject to certain exclusions.

Section B goes on to list "Additional Coverages for physical loss or damage," all of which "are subject to the Policy provisions, including applicable exclusions and deductibles." The list of additional coverages includes the following potentially relevant provisions:

**Expenses to Reduce Loss**

Policy covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy, however, such expenses shall not exceed the amount by which the loss as covered by this policy is thereby reduced. It is expressly understood and agreed that any expense incurred by the Insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder.

**Professional Fees**

This Policy covers the actual costs incurred by the Insured payable to accountants, architects, surveyors, auditors, engineers, or other professionals hired by the Insured and the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Insurers resulting from insured loss payable under this Policy for which the Insurers has accepted liability.

1) This coverage will not include the fees and costs of attorneys, public adjusters, loss appraisers, who provide consultation on coverage or negotiate claims.

2) This Additional Coverage is subject to the deductible that applies to the loss.

**Protection and Preservation of Property**

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property.

. . . .

Insured Property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible, sublimit of liability and policy limit.

Section C, "Time Element," includes similar provisions. First, the "Loss Insured" subsection specifies that the policy "insures Time Element loss, as provided in the Time Element Coverages, directly resulting from physical loss or damage of the type insured by this Policy," subject to certain criteria. The same subsection goes on to note that the policy also

covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

Section C then lists specific "Time Element Coverages" and "Time Element Coverage Extensions."  The "Time Element Coverages" include the following potentially relevant provision:

**Business Interruption/Loss of Income**

This policy insured the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage by a peril not excluded by this policy occurring during the policy period to any insured property as provided herein.

The "Time Element Coverage Extensions" subsection includes the following two provisions:

**Consequential Loss**

This policy insures against consequential loss to the property insured and resultant Time Element losses caused by change of temperature or humidity.

Further, in the event of loss or damage to any property by reason of any peril insured against and such damage, without the intervention of any other

independent cause, results in a sequence of events which causes physical damage to other property insured by this policy, and/or the Insured sustains an interruption of business as covered hereunder, then this policy will cover such resulting loss or damage.

The Insurer(s) also agree to insure against loss to undamaged insured property not directly involved in the insured event (within a one (1) mile radius of the damaged property) that requires redesigning, relocation, removal or reconstruction due to the insured event.

. . . .

**Protection And Preservation Of Property – Time Element**

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this Policy at such insured property.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

### C.    *Procedural background*

Following the insurers' denial of coverage, Florida East Coast brought the instant suit, alleging the insurers had breached their contract with Florida East Coast by (a) denying it coverage for the costs associated with removing, storing, and reinstalling the crossing gates and for lost revenues between September 7 and September 18, 2017, and (b) miscalculating the applicable deductible.  After discovery, the parties each moved for summary judgment.  The district court granted the insurers summary judgment and denied Florida East Coast's motion.

In its order, the district court reviewed the policy provisions cited by the parties and concluded that only the "Protection and Preservation of Property" provisions from Sections B and C of the policy applied.[3]  The court went on to determine that the language of these two provisions called for application of the "Named Windstorm" deductible.  Although no locations were damaged, the court read the two provisions to require calculation of the deductible amount based on 5% of the total property values of the crossing gates for all 600 affected locations.  Because that amount— at least $10,950,994.70, by the court's calculation—was significantly higher than Florida East Coast's claimed expenses of $5,605,881,

---

[3] Because the Section C "Protection and Preservation of Property" provision limited coverage to the 48 hours before and the 48 hours after Florida East Coast began taking preventative measures, the district court limited Florida East Coast's lost revenue claim to September 7 through September 9.  Florida East Coast does not allege losses prior to September 7.

the court concluded that the insurers had no obligation to pay Florida East Coast and thus had not breached the insurance agreement.

Florida East Coast timely appealed.

## II.    Standard of Review

Because Florida East Coast brings state law contract claims, "we apply the substantive law of Florida, the forum state, in this diversity action."[4] *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1049 (11th Cir. 2020) (quotation omitted). "We review the district court's determination and application of Florida law in a summary judgment ruling de novo." *Horn v. Liberty Ins. Underwriters, Inc.*, 998 F.3d 1289, 1293 (11th Cir. 2021) (quotations omitted). "Summary judgment is appropriate only where there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Under Florida law, "[t]he interpretation of provisions in an insurance contract is a question of law reviewed *de novo*." *James River Ins. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008).

## III.    Discussion

Florida East Coast challenges two aspects of the district court's analysis. It argues the court erred when it (1) concluded that only the "Protection and Preservation of Property" provisions

---

[4] The parties agree that Florida law governs.

(the "Protection" provisions) governed the coverage at issue and (2) calculated the applicable deductible based on the total property values for all affected locations. Florida East Coast contends that the "Expenses to Reduce Loss," "Business Interruption," and "Consequential Loss" provisions overlap the "Protection" provisions and offer greater coverage, so they govern its claims. And it argues that because no locations were damaged, the deductible is limited to $750,000. The insurers respond that the district court correctly analyzed both the relevant coverage provisions and the corresponding deductible and properly granted them summary judgment because Florida East Coast's claim was less than the deductible. We agree with the district court that the "Protection" provisions provide the relevant coverage for this claim, but we conclude that the applicable deductible is only $750,000 because there were no damaged locations from which to calculate a higher deductible. Thus, because Florida East Coast's claimed loss is greater than the applicable deductible, summary judgment in favor of the insurers was not appropriate. Accordingly, we vacate the district court's order and remand for further proceedings.

"[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). "Policy terms are given their plain and ordinary meaning and read in light of the skill and experience of ordinary people." *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008) (citing Florida cases); *see also Southern-Owners Ins. Co. v.*

*Easdon Rhodes & Assocs. LLC*, 872 F.3d 1161, 1164 (11th Cir. 2017) (emphasizing the importance of providing "a reasonable, practical and sensible interpretation consistent with the intent of the parties" (quotations omitted)).

"Where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written." *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013). If contract language is ambiguous—meaning it "is susceptible to more than one reasonable interpretation"—then Florida law calls for the ambiguities to be resolved in favor of coverage. *Anderson*, 756 So. 2d at 34. A provision "is not automatically rendered ambiguous," however, "simply because [it] is complex and requires analysis for application." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). Importantly, we will not accept "a strained and unnatural construction o[f] the terms of a policy in order to create an uncertainty or ambiguity," nor does the "failure to provide a definition for a term . . . necessarily render the term ambiguous." *Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc.*, 586 So. 2d 95, 97 (Fla. 5th DCA 1991).

### A.    The relevant coverage provisions

Florida East Coast points to several policy provisions that it believes apply and argues that if multiple provisions provide overlapping coverage, it may select which provision under which to bring a claim. The insurers respond that only the "Protection" provisions apply. We briefly discuss the "Protection" provisions,

which both parties agree offer coverage, then focus our inquiry on whether any other provision offers additional or overlapping coverage.

### 1.    The "Protection" provisions

The Section B (Property Damage) "Protection" provision offers coverage for "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property" when such actions are necessary "to prevent immediately impending, insured direct physical loss or damage to such insured property." Similarly, the corresponding Section C (Time Element) "Protection" provision is a "Time Element Coverage Extension[]" that covers the insured's losses 48 hours before and after "the Insured first tak[es] reasonable action for the temporary protection and preservation of property insured by this Policy" when "such action is necessary to prevent immediately impending direct physical loss or damage."

As the parties agree, these two provisions clearly apply to the types of expenses for which Florida East Coast is claiming coverage. In order to "prevent . . . direct physical loss or damage" to its crossing gates from Hurricane Irma, Florida East Coast removed and stored many of those gates and then restored them after the storm had passed. These "reasonable action[s]" to preserve insured property created time element losses: train crossings without gates required either significantly reduced train speeds or a physically present person monitoring the crossing. These precautions were intended to—and did—prevent significant

physical damage, such as aluminum gates being torn off and blown into other structures, and corresponding time element losses, such as delays for the construction and installation of new gates.

Thus, we agree with the district court that the Section B "Protection" provision covers the expenses Florida East Coast incurred to protect the crossing gates, and the Section C "Protection" provision applies to Florida East Coast's lost revenues due to its preventative measures.  However, Florida East Coast argues that coverage under the "Protection" provisions does not end the inquiry.  Instead, it points to other provisions that it alleges also apply.  We discuss these provisions below.

> 2.    The Section B "Expenses to Reduce Loss" provision and the Section C "reduce the loss" provision

The Section B "Expenses to Reduce Loss" provision states that the policy "covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy."  It goes on to clarify that "any expense incurred . . . as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder."  The corresponding Section C "reduce the loss" provision states that the policy "covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section" of the policy.

Florida East Coast argues that these provisions—what it calls the "sue-and-labor clauses"—should be read to cover actions taken to prevent loss (*i.e.*, actions taken to reduce potential loss). In other words, because Hurricane Irma would almost certainly

have damaged Florida East Coast's crossing gates, potentially injured nearby people, and extended interruptions in operations to perform repairs, Florida East Coast argues that it "greatly diminished the amount of these covered losses" by preemptively removing the gates, thereby "reducing the claimed property damage to zero." The insurers respond that these provisions cover only expenses to "reduce the loss from damage that *already* ha[s] occurred" (emphasis in original), so they do not apply to Florida East Coast's preventative actions. We agree with the insurers' reading.[5]

Both read on its own and in context, the word "reduce"—used in both provisions—clearly does not cover Florida East

---

[5] The district court's order did not directly address this Section C provision, although it did analyze the Section B "Expenses to Reduce Loss" provision. While we generally do "not reach the merits of an issue not considered by the district court," we may nevertheless exercise our discretion to do so. *Ochran v. United States*, 117 F.3d 495, 502–03 (11th Cir. 1997) (quotations omitted). Because we review questions of contract interpretation *de novo*, and because the parties argue parallel interpretations of the Section B and Section C provisions, we may appropriately consider the Section C provision here.

The insurers, for their part, contend that Florida East Coast forfeited any claim based on the Section C "reduce the loss" provision because it "only made a passing reference" to that provision below and "did not expressly argue that it applied." We agree that Florida East Coast could have raised this provision more clearly in its summary judgment briefing, but it did recite the language of the provision as part of its argument that the insurers wrongly denied its time element claims. In any event, since we conclude that this provision does not apply, we need not decide whether Florida East Coast forfeited this argument.

Coast's precautionary actions.  The relevant definition of "reduce" is "to diminish in size, amount, extent, or number."  *Reduce*, Merriam-Webster (Mar. 1, 2026), https://www.merriam-webster.com/dictionary/reduce     [https://perma.cc/3WVW-NY82]; *see Gov't Emps. Ins. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017) ("When a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning.").  To "reduce" loss, then, there must be some loss to begin with—something that can "diminish."  And each section of the policy specifies the relevant kind of loss:  For Section B, "loss under this policy" points back to the "Insuring Clause," which states that the policy covers "direct physical loss or damage to the insured property."  Likewise, the general provisions governing Section C specify that covered "Time Element loss[es]" are those that "directly result[] from physical loss or damage."[6]  Florida East Coast would have us hold that these two provisions, which speak of reducing loss, cover expenses incurred to reduce the *risk* of loss,

---

[6] And as we discuss below, the individual Time Element provisions Florida East Coast raises—the "Business Interruption" and "Consequential Loss" provisions—are themselves expressly conditioned on "direct physical loss and/or damage" and "loss or damage to . . . property" (and thus inapplicable here).  While Florida East Coast's actions likely prevented the much more substantial revenue losses that would have occurred if its crossing gates had been damaged, it did not "reduce" the "reduction of business income caused by or resulting from direct physical loss and/or damage."  So, again, its preventative actions are not covered by the Section C "reduce the loss" provision.

18                    Opinion of the Court                    24-11479

especially when such loss is almost certain to occur absent its precautionary actions. But the provisions do not read "risk of loss," "potential for loss," "likelihood of loss," or any similar formulation. They cover only expenses incurred to reduce loss actually sustained (and Florida East Coast does not claim there was any such physical loss to reduce).[7]

The context the other policy provisions offer confirms this interpretation. We "read each policy as a whole" in an attempt to "give every provision its full meaning and operative effect." *Anderson*, 756 So. 2d at 34. And generally, "the use of different language in different contractual provisions strongly implies that a different meaning was intended." *Aleman v. Gervas*, 314 So. 3d 350, 352 (Fla. 3d DCA 2020) (quotations omitted). Here, the policy's other provisions use different language to clearly cover prevention of loss. Specifically, the "Protection" provisions cover costs incurred to "temporarily protect or preserve insured property" and to "prevent immediately impending, insured direct physical loss or damage." Interpreting "reduce" to mean minimizing loss after it occurs gives the word a different meaning than "protect," "preserve," and "prevent," which explicitly point to "impending" loss. Thus, the policy, read "as a whole," supports our conclusion

---

[7] We note that while Florida East Coast disagrees with our reading of the word "reduce" and our resulting interpretation of these provisions, it appears to agree that "loss under this policy" refers to physical loss. It describes the relevant "loss under this policy" as "the property damage and lost business which would have occurred had Irma destroyed [Florida East Coast's] crossing gates."

that the two "reduce" provisions do not cover Florida East Coast's preventative measures.[8]

Florida East Coast nonetheless argues that its reading is correct because the "reduce" provisions are "classic sue-and-labor clauses" that are meant for the benefit of insurers by placing a duty on the insured—and a corresponding incentive—to "reduc[e] imminent losses." Such clauses "undertake[] to reimburse the assured for . . . expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether." *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488 (5th Cir. 1960).[9] Florida East Coast thus argues that "[a]ny interpretation that limits the coverage provided by such a sue-and-labor clause to only post-storm expenses is *per se* unreasonable." But Florida East Coast cannot overcome the plain language of the provisions, and of the policy as a whole, simply by calling these provisions "sue-and-labor clauses" and then pointing to caselaw-recognized incentives for such clauses,[10] particularly when another

---

[8] In concluding that the "Expenses to Reduce Loss" provision does not apply here, the district court also relied on the canon against surplusage, and Florida East Coast challenges the district court's use of that canon. Because we find the language itself is clear, we do not rely on this canon to reach our conclusion, so we need not address this argument.

[9] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (holding that all decisions from the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit").

[10] Indeed, Florida East Coast recognizes that the specific language of a particular policy governs over general legal principles: it distinguishes cases

provision in each section—the "Protection" provisions—expressly provides just such an incentive for the insured to prevent physical loss and damage to the insured properties.[11] *See Ruderman*, 117 So. at 948.

We therefore conclude that the Section B "Expenses to Reduce Loss" provision and the Section C "reduce the loss" provision do not offer coverage for Florida East Coast's claimed expenses.

---

cited by the insurers by arguing that the policies at issue in those cases "contained materially different language."

[11] Even if there were no separate provisions in this policy covering preventative actions, the Florida Supreme Court has demonstrated that a so-called "sue-and-labor" clause need not necessarily provide coverage for such preventative measures. *See Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 168–69 (Fla. 2003) (holding that a sue-and-labor clause did not provide coverage for prevention efforts where the language of the clause said nothing about payment for prevention efforts). While Florida East Coast rightly points out that *Swire* does not control the decision in this case (because the relevant policy language is different), *Swire* does refute Florida East Coast's argument that the presence of a sue-and-labor clause—regardless of the clause's clear language—automatically requires reimbursement of all expenses undertaken to prevent damage or loss. *See id.* at 168 (looking to the "plain language of the provision" to determine that "sue and labor expenses" were "recoverable only in the case of loss or damage"); *id.* at 169 ("If the Sue and Labor clause had been worded differently or if it had included language concerning the prevention of loss, the conclusion may have been different."). As in *Swire*, "we must address the specific contract and specific facts before us to render our analysis." *Id.* at 169.

3.      The Section C "Business Interruption/Loss of
        Income" and "Consequential Loss" provisions

As discussed previously, the Section C "Protection" provision limits coverage for lost revenues to the 48 hours before and the 48 hours after the insured's first preventative action. Florida East Coast argues that two other provisions in Section C— the "Business Interruption/Loss of Income" and "Consequential Loss" provisions—offer broader coverage for its lost revenues from September 7 through September 18, 2017. We conclude, however, that neither the "Business Interruption" nor the "Consequential Loss" provision provides coverage here.

The "Business Interruption" provision covers "the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage by a peril not excluded by this policy . . . to any insured property." This coverage continues "for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred." Florida East Coast argues that its lost revenues from September 7 through September 18, 2017—resulting from the removal and reinstallation of the crossing gates and the related train delays—were caused by "direct physical loss" to the insured property because "[d]irect physical 'loss' includes costs resulting from physical intervention and alteration of the crossing to avoid property damage and additional loss." It argues that a "material

alteration" of the property that results in "the diminution of [its] value" counts as "direct physical loss," so this provision covers the reduced revenues resulting from its own "material alteration of insured property to avert loss" from Hurricane Irma.  The insurers respond that Florida East Coast's "preventative removal and on-site storage of the crossing gates prior to the storm does not constitute 'direct physical loss.'"

Even assuming that Florida East Coast is correct that "direct physical loss" includes a material alteration of the property, the plain language of this provision covers only lost revenues resulting from "direct physical loss and/or damage *by a peril*" (emphasis added).  Here, the only "material alteration" to the insured property was purposely caused by Florida East Coast itself.  Specifically, the crossing gates were not lost or materially altered by a covered "peril"; rather, they were voluntarily disassembled and reassembled by Florida East Coast.  And thanks to Florida East Coast's actions, none of the gates were lost or even damaged.  The physical changes to these gates were thus not a "loss . . . by a peril" but rather loss prevention.  Although Florida East Coast urges us to conclude that Hurricane Irma "forced" the material alterations it made, and therefore the lost revenues should be covered by this provision, that interpretation would require reading words into the policy, such as "loss *ascribable to* a peril" or "loss *made necessary by* a peril."  But "[i]t is inappropriate . . . to attempt to add language to the contract which changes its effect in an attempt to secure coverage."  *Swire Pac. Holdings*, 845 So. 2d at 168; *id.* at 169 (explaining that we are bound to "address the specific contract and

specific facts before us"). Accordingly, without claimed physical loss or damage, the "Business Interruption" provision offers no coverage for the lost revenues.

Florida East Coast's arguments regarding the "Consequential Loss" provision fail for the same reason. This provision uses very similar language, stating that if some "loss or damage" to property occurs "by reason of any peril insured against" and "the Insured sustains an interruption of business as covered hereunder, then this policy will cover such resulting loss or damage." Again, contrary to Florida East Coast's contentions, the removal of the crossing gates was not a "loss" from a peril. When, as here, no loss or damage to property has occurred, this provision has no application.[12]

---

[12] In the proceedings below, Florida East Coast argued that its lost revenues were also covered by the Section C "Extra Expense" provision, which provides coverage for the insured's "incur[red] expenses over and above normal expenses in order to continue normal operations following direct physical loss and/or damage by a peril" to insured property. Such expenses include costs associated with "rebuild[ing], repair[ing,] or replac[ing] such part of the property insured by th[e] policy as has been damaged or destroyed." The district court concluded that the "Extra Expense" provision did not apply because it is conditioned on "direct physical loss and/or damage by a peril not excluded by this policy to property." Florida East Coast does not appear to contest this conclusion on appeal, and, in any event, we agree with the district court.

Additionally, for the first time on appeal, Florida East Coast argues that the "Professional Fees" provision covers the expenses it incurred hiring Pyxis to provide documentation of Florida East Coast's claimed losses. The district court did not consider this provision, and the insurers do not address whether

### B.    The relevant deductible

Having concluded that Florida East Coast's claims are covered by the "Protection" provisions, we turn to the last remaining question—the relevant deductible.  The parties agree that the claims at issue concern "Railroad Operations."  They also appear to agree that Hurricane Irma was a "Named Windstorm," such that the appropriate deductible is the greater of $750,000 or "5% of property values at locations damaged from and as respects Named Windstorm."  They disagree, however, whether the 5% can be calculated based on the property value of all locations giving rise to claims, regardless of whether those locations were damaged.

Florida East Coast asserts that even if (as we have concluded) only the "Protection" provisions apply, those provisions do not call for a deductible greater than $750,000.  It argues that when no locations are damaged, it is impossible to calculate 5% of the property value of damaged locations (or that performing such a calculation results in a deductible of $0), so the $750,000 deductible applies.  The insurers respond that the "Protection" provisions explicitly require application of the Named Windstorm deductible and call for a deductible of 5% of the "property values at the locations where [Florida East Coast] took steps to protect and/or preserve property."

---

we should consider this claim for the first time on appeal.  We therefore remand for the district court to consider in the first instance whether Florida East Coast has preserved a claim for "Professional Fees" and, if so, whether the provision offers coverage.

The district court agreed with the insurers' position and calculated the applicable deductible at 5% of the minimum value of the crossing gate systems, which yielded a deductible of over $10.9 million. We disagree with this deductible calculation because the plain text of the policy leads to the conclusion that the deductible is $750,000. The Section B "Protection" provision includes the following instruction: "Insured Property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible, sublimit of liability and policy limit." The meaning is straightforward: any expenses claimed under this "Protection" provision are added to any other amounts claimed for physical loss or damage under any other provision in the policy, and that total amount is "subject to the applicable deductible." In this case, there are no physical loss or damage claims to which Florida East Coast's preventative expenses must be added. The "applicable deductible," then, is the "Railroad Operations" deductible, as modified by the "Named Windstorm" clause. The "Protection" provision does not set the specific deductible *amount* that applies; it simply instructs how to choose the relevant deductible *provision*.

Similarly, the Section C "Protection" provision requires use of "the deductible provisions that would have applied had the physical loss or damage occurred." Again, this language directs the selection of the appropriate deductible *provision*; it does not require that the deductible *amount* be calculated as if the physical loss or damage had occurred.

Proceeding then, as these provisions direct us, to the applicable deductible provision, the relevant deductible is "5% of property values at locations damaged from and as respects Named Windstorm" or $750,000, whichever is greater.  Because Florida East Coast has not claimed any damaged locations, $750,000 is greater than 5% of zero.

★   ★   ★

In summary, then, we conclude that the "Protection" provisions in Sections B and C provide the relevant coverage for Florida East Coast's claimed expenses related to removing and replacing the crossing gates and the resulting revenue losses and that the relevant deductible is $750,000.  Because we conclude that this lower deductible applies, we vacate the district court's order granting summary judgment to the insurers, and we remand for the district court to determine the amount Florida East Coast is entitled to recover in light of the lower deductible.

## IV.    Conclusion

For these reasons, we affirm in part, vacate the grant of summary judgment to the insurers, and remand for proceedings consistent with this opinion.

**VACATED AND REMANDED.**